```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/26/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOEL NEWMAN, Individually and on Behalf of All
Others Similarly Situated, et al.,

                          Plaintiffs,

            -against-

SL GREEN REALTY CORP., et al.,

                          Defendants.

---

24-CV-00335 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiffs brought this putative class action in diversity under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), against Defendants for failure to disclose the total costs of tickets, including ancillary fees, to SUMMIT One Vanderbilt ("SUMMIT One"), prior to the tickets being selected for purchase online, in violation of New York Arts & Cultural Affairs Law § 25.07(4) ("Section 25.07(4)").  Defendants have moved to compel arbitration of Plaintiffs' claims on an individual basis.  Dkt. No. 20.  For the reasons stated herein, the Court GRANTS Defendants' motion.

## FACTS & PROCEDURAL BACKGROUND

On January 16, 2024, Plaintiff Joel Newman initiated this putative class action in diversity under CAFA.  Dkt. No. 1.  On March 12, 2024, Newman amended the complaint, adding Eric Gutman and William Wong as named plaintiffs.  Dkt. No. 17 ("Amended Complaint" or "Am. Compl.").  Plaintiffs are individual consumers who purchased tickets to SUMMIT One, an immersive multisensory experience and observation deck in the One Vanderbilt building at 45 E. 42nd Street in Manhattan, prior to February 2024.  *See* Am. Compl. ¶¶ 8–10; *see also* Dkt. No. 22 ("Williams Decl.") ¶¶ 6–7 & Ex. A.  Specifically, Newman

purchased one ticket on January 12, 2024; Gutman purchased two tickets on April 23, 2023; and Wong purchased two tickets on December 17, 2023.  *See* Am. Compl. ¶¶ 8 (allegations regarding Newman's purchase), 9 (allegations regarding Gutman's purchase), 10 (allegations regarding Wong's purchase); *see also* Williams Decl. ¶¶ 6–7 & Ex. A.  Defendant SL Green Realty Corp. owns and operates the One Vanderbilt building.  *See* Am. Compl. ¶ 11.  Defendant Summit OVA Tenant LLC ("Summit OVA") sells tickets to SUMMIT One through its website, found at https://summitov.com (the "Website").  *See id.* ¶ 12; Williams Decl. ¶¶ 1–4

Plaintiffs allege that, prior to February 2024, Defendants did not properly disclose the total cost and fees of tickets to SUMMIT One, specifically by failing to disclose an additional $3.00 processing fee associated with each order prior to purchase, in violation of Section 25.07(4).  *See* Am. Compl. ¶¶ 1, 3, 27–28.  Section 25.07(4) provides:

> Every operator or operator's agent of a place of entertainment, any licensee or other ticket reseller, or platform that facilitates the sale or resale of tickets shall disclose the total cost of the ticket, inclusive of all ancillary fees that must be paid in order to purchase the ticket, and disclose in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a service charge, or any other fee or surcharge to the purchaser.  Such disclosure of the total cost and fees shall be displayed in the ticket listing prior to the ticket being selected for purchase.

N.Y. Arts & Cult. Aff. L. § 25.07(4); *see* Am. Compl. ¶ 18.  New York law provides a private right of action for individuals such as Plaintiffs to seek injunctive relief, actual or statutory damages, and fees for violations of Section 25.07.  *See* N.Y. Arts & Cult. Aff. L. § 25.33.

Plaintiffs allege, and Defendants do not contest, *see* Williams Decl. ¶¶ 8(i)–(vii), that Plaintiffs went through the following process when they purchased their tickets through the Website:[1]

---

[1] At some point after the filing of the initial complaint in this action, Defendants revised the Website, adding the $3.00 processing fee to each order at the first and second steps in the purchase process.  *See* Am. Compl. ¶¶ 29–33; Williams Decl. ¶ 4.

First, they clicked on the "BUY TICKETS" button on the Website, which initially prompted them to select a ticket package, each of which had a corresponding "starting at" price displayed. Am. Compl. ¶¶ 22–23. Next, after selecting a ticket package, they were prompted to select either an "Adult" or "Youth" ticket, each of which had a corresponding "starting at" price displayed. *Id.* ¶ 24. Then, they were prompted to select a date and time for their visit. *Id.* ¶ 25. Finally, they were presented with a final checkout screen, which displayed the "total" ticket price, including an additional $3.00 "online processing fee" that was not previously indicated at any point prior to or during the purchase process. *Id.* ¶¶ 26–28.

In addition to the foregoing, in his original declaration, Michael Williams, General Manager and Managing Director of Summit OVA, described the checkout process that Plaintiffs went through to complete their purchases. *See* Williams Decl. ¶¶ 8(viii)–(xi). After inputting their payment method and details, Plaintiffs had to click a "Submit Order" button to finalize their purchases. *See id.* ¶ 8(ix). Directly above the "Submit Order" button, there was a button box that Plaintiffs were required to click in order to activate the "Submit Order" button. *See id.* ¶ 8(x). The text next to the button box provided:

> I accept and agree to the Terms and Conditions, including the Release and Waiver of Liability. I acknowledge that SUMMIT One Vanderbilt is an immersive experience containing flashing lights, and mirrored floors, walls and ceilings. I understand that I am responsible for dressing in a manner to avoid any unwanted exposure, and must avoid wearing footwear that can damage mirrored floors, including but not limited to, stiletto heels, sports cleats or spikes, and steel-toed boots. View Terms and Conditions.

*Id.* Figure 6. The last sentence, "View Terms and Conditions," was a hyperlink in red text that, if clicked, presented certain terms and conditions via a popup window. *Id.* ¶ 8(xi) & Figure 7.

The applicable terms and conditions at the time that Gutman purchased his tickets on April 23, 2023, were effective August 2021. *See id.* ¶¶ 11, 14; *id.* Ex. C ("Gutman T&C"). The terms and conditions were then updated on June 28, 2023, and was effective at the time that

3

Newman and Wong purchased their tickets. *See id.* ¶¶ 10, 12–13; *id.* Ex. B ("Newman & Wong

T&C," together with the Gutman T&C, the "Summit T&Cs"). The Summit T&Cs included

arbitration, class action waiver, and choice of law provisions.

> The Gutman T&C provides:
>
> Any dispute or claim relating in any way to SUMMIT One Vanderbilt or [Summit OV, LLC] will be resolved by binding arbitration, rather than in court. The Federal Arbitration Act and federal arbitration law, and the laws of the State of New York, apply to this Agreement and any matters relating to this Agreement.
> . . . .
> The arbitration will be conducted by the American Arbitration Association (AAA) under its then-current rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes.
> . . . .
> We each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated, or representative action.

Gutman T&C ¶ 5; *see also* Williams Decl. ¶ 17.

> The Newman & Wong T&C provides:
>
> Any dispute, claim, or controversy, including those known or unknown that may be later discovered, relating in any way to this Agreement, other agreements by us, the Privacy Party, or the SUMMIT One Vanderbilt Experience or the Released Parties[, defined in Paragraph 4 of this Agreement,] will be resolved by binding arbitration, rather than in court. The Federal Arbitration Act and federal arbitration law, and the laws of the State of New York, apply to this Agreement and any matters relating to this Agreement.
> . . . .
> The arbitration will be conducted in accordance with the expedited procedures set forth in the JAMS Comprehensive Arbitration Rules and Procedures as those Rules exist on the effective date of this Agreement[.]
> . . . .
> You agree that any claims or arbitration under this Agreement will take place on an individual basis. You and we agree that each may bring claims against the other only in your or our individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding, class arbitrations and class actions are not permitted, and you are agreeing to give up the ability to participate in a class arbitration or class action.

Newman & Wong T&C ¶ 10 (text case altered); *see also* Williams Decl. ¶ 16.

On April 12, 2024, Defendants moved to compel individual arbitrations of Plaintiffs'

claims and stay this action pending the resolution of the arbitrations.  Dkt. No. 20.[2]

## DISCUSSION

## I.    LEGAL STANDARD

Under Section 2 of the Federal Arbitration Act ("FAA"), arbitration agreements are

generally "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in

equity for the revocation of any contract."  9 U.S.C. § 2.  "Where a party to an arbitration

agreement refuses to comply with that agreement, and instead attempts to proceed in litigation,

the other party may move to stay the litigation . . . and compel arbitration."  *Chen-Oster v.*

*Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 240 (S.D.N.Y. 2020) (citing 9 U.S.C. §§ 3–4).  The

FAA establishes "'a liberal federal policy favoring arbitration agreements.'"  *New Prime Inc. v.*

*Oliveira*, 586 U.S. 105, 120 (2019) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

*Corp.,* 460 U.S. 1, 24 (1983)).  The FAA "'leaves no place for the exercise of discretion by a

district court,'" instead mandating "'arbitration on issues as to which an arbitration agreement

has been signed.'"  *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *Dean*

*Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

In assessing the enforceability of an arbitration clause, courts must determine (1) whether

the parties have entered into a valid agreement to arbitrate, and (2) whether the dispute at issue

comes within the scope of the arbitration agreement.  *In re Am. Exp. Fin. Advisors Sec. Litig.*,

672 F.3d 113, 128 (2d Cir. 2011).  The FAA requires courts to enforce arbitration agreements

"according to their terms."  *Id.* at 127 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland*

---

[2] The Court shall refer to the parties' memoranda of law in support of and opposition to
Defendants' motion to compel arbitration as follows: Dkt. No. 21 ("Mot."); Dkt. No. 24 ("Opp."); Dkt.
No. 27 ("Reply").

*Stanford, Jr. Univ.,* 489 U.S. 468, 479 (1989)).  Any ambiguities as to the scope of the arbitration

clause must be "resolved in favor of arbitration."  *See Bechtel do Brasil Construcoes Ltda. v.*

*UEG Araucaria Ltda.*, 638 F.3d 150, 155 (2d Cir. 2011) (citing *Moses H. Cone Mem'l Hosp. v.*

*Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).  Federal courts "apply ordinary state-law

principles that govern the formation of contracts" in determining whether a valid agreement to

arbitrate exists.  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

The standard of review for a motion to compel arbitration is "similar to that applicable

for a motion for summary judgment."  *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th

95, 101 (2d Cir. 2022) (internal references omitted).  As with a motion for summary judgment,

the Court "considers all relevant, admissible evidence submitted by the parties and contained in

pleadings, depositions, answers to interrogatories, and admissions on file, together with

affidavits, and draws all reasonable inferences in favor of the non-moving party."  *Meyer v. Uber*

*Techs, Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal references omitted).  If the undisputed

factual record supports a legal determination as to arbitrability, the Court "may rule on the basis

of that legal issue and avoid the need for further court proceedings."  *Wachovia Bank N.A. v.*

*VCG Special Opportunities Master Fund*, 661 F.3d 164, 172 (2d Cir. 2011) (internal citations

omitted).

"Once the existence of an agreement to arbitrate is established, the burden shifts to the

party seeking to avoid arbitration to show the agreement to be inapplicable or invalid."

*Zachman*, 49 F.4th at 102 (internal references omitted); *see Green Tree Fin. Corp.-Ala. v.*

*Randolph*, 531 U.S. 79, 91 (2000).  The party resisting arbitration may not satisfy this burden

through "general denials of the facts on which the right to arbitration depends . . . but must

submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

## II.    PLAINTIFFS ARE REQUIRED TO INDIVIDUALLY ARBITRATE THEIR CLAIMS UNDER THE PLAIN LANGUAGE OF THE BINDING SUMMIT T&CS

Defendants argue that (1) upon purchasing their tickets, Plaintiffs assented to clickwrap terms and conditions, the Summit T&Cs, which included mandatory arbitration provisions and class action waiver provisions; and (2) the binding Summit T&Cs cover Plaintiffs' claims under Section 25.07(4) and require individual arbitration of such claims.  Plaintiffs dispute both the existence of a valid arbitration agreements and the arbitrability of their claims

On the record before the Court, there is no genuine dispute of fact that Plaintiffs had notice of the Summit T&Cs and manifested their assent to their respective terms and conditions prior to purchasing their tickets.  Under the plain language of the applicable terms and conditions as to each Plaintiff, the Court finds that Plaintiffs must arbitrate their claims and must do so on an individual basis.

### A.  Existence of Arbitration Agreements

#### 1.    Legal Standard

Whether a valid arbitration agreement exists is a matter of state contract law.  *Meyer*, 868 F.3d at 73–74.  Here, the parties do not dispute that New York law applies to the Summit T&Cs. *See* Mot. at 8; Opp. at 7 n.8; *see also* Gutman T&C ¶ 5 (including New York choice of law provision); Newman & Wong T&C ¶ 10 (same).  To form a valid contract under New York law, there must be a "meeting of the minds" and "a manifestation of mutual assent" through word or conduct.  *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019) ("Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract.").

Courts have grouped Internet-based agreements between users of a platform into several categories, including, as relevant here, clickwrap agreements, which require a user to affirmatively click "I agree," thereby acknowledging awareness of and agreement to the terms of the contract, but do not require proof that the user actually viewed or read the contract to which she is assenting. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394–95, 397 (E.D.N.Y. 2015). "Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'" *Meyer*, 868 F.3d at 75; *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (collecting cases).

However, the mere classification of an Internet-based agreement as a clickwrap agreement does not necessarily determine the contract's enforceability. *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 640 (S.D.N.Y. 2020); *see also Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 124 (2d Cir. 2012). While failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract, *see Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 11 (1988), where, as here, the users claim not to have actual notice of the terms of the contract, courts will assess whether a reasonably prudent person would have been on inquiry notice of the terms, such that the users are still bound by the contract. *Meyer*, 868 F.3d at 74–75; *Schnabel*, 697 F.3d at 120 ("[W]here there is no actual notice of the term, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent.") (emphasis omitted). Whether a user is on inquiry notice is a fact-intensive analysis. *Meyer*, 868 F.3d at 76 (citing *Schnabel*, 697 F.3d at 124); *see Valelly*, 464 F. Supp. 3d at 640 ("[I]n the context of clickwrap agreements, in addition to verifying that the user was required to indicate her assent, the court must consider whether the agreement's terms and

8

conditions were 'reasonably conspicuous.'") (quoting *Meyer*, 868 F.3d at 77).  Inquiry notice

depends on the "clarity and conspicuousness of arbitration terms."  *Meyer*, 868 F.3d at 75

(internal references omitted).  In the context of Internet-based contracts, "clarity and

conspicuousness are a function of the design and content of the relevant interface."  *Id.*  An

arbitration agreement "exists where the notice of the arbitration provision was reasonably

conspicuous and manifestation of assent unambiguous as a matter of law."  *Id.* at 76; *Specht v.*

*Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002).

### 2.    Inquiry Notice and Assent

Based on the record evidence, the Court finds Defendants have made a *prima facie*

showing that the Summit T&Cs are valid arbitration agreements—Defendants have shown that

Plaintiffs were required to affirmatively agree to the reasonably conspicuous Summit T&Cs,

which include binding arbitration provisions.

In his original declaration, Mr. Williams represented that Plaintiffs were required to click

a button box indicating that they accept and agree to the Summit T&Cs in order to finalize their

purchases.  Williams Decl. ¶¶ 8(ix)–(x).  Further, the Summit T&Cs were readily viewable via a

popup window upon clicking the hyperlink "View Terms and Conditions," which appeared in

red text next to the button box assent language.  *Id.* ¶¶ 8(x)–(xi).  A reasonably prudent user

would know that the red hyperlink text would lead to another window, *i.e.*, a pop-up where

additional information on the Summit T&Cs would be available, *see Meyer*, 868 F.3d at 75–78,

and would "have noticed the link and reviewed the terms before clicking on the

acknowledgement icon." *Fteja*, 841 F. Supp. 2d at 839–41; *see also Berkson*, 97 F. Supp. 3d at

400 (collecting cases for the proposition that terms of use "will be enforced when a user is

encouraged by the design and content of the website and the agreement's webpage to examine

the terms clearly available through hyperlinkage"); *Bassett v. Elec. Arts Inc.*, No. 13-CV-04208,

2015 WL 1298644, at *4 (E.D.N.Y. Feb. 9, 2015) (collecting cases for the proposition that federal courts have "consistently enforced clauses contained in clickwrap agreements" that could be viewed only by following a conspicuous hyperlink). Further, the physical proximity of the notice of assent to the hyperlinked Summit T&Cs sufficiently informed Plaintiffs of the consequences of their assenting clicks and ticket purchases. *See Meyer*, 868 F.3d at 79–80.

Plaintiffs argue that the checkout page presented to them did not provide reasonably conspicuous notice of the Summit T&Cs because the red hyperlink "View Terms and Conditions" was not bolded or capitalized, and the checkout page utilized a variety of font sizes and colors. *See* Opp. 14–15. Plaintiffs do not, and cannot, cite to any authority establishing that, as a matter of law, notice of the Summit T&Cs needed to take a particular form, *i.e.*, in bold or capitalized text, or that the checkout page needed to use only one font size and color, in order for the Court to find that the hyperlinked Summit T&Cs were reasonably conspicuous to the prudent user. *See Soliman v. Subway Franchisee Advertising Fund Tr., Ltd.*, 999 F.3d 828, 842 (2d Cir. 2021) ("[N]o particular features . . . must be present to satisfy the reasonably conspicuous standard."); *Meyer*, 868 F.3d at 75 ("[T]here are infinite ways to design a website.").

Moreover, the Court finds the checkout page contained familiar indicia that provided reasonably conspicuous notice of the Summit T&Cs to Plaintiffs. Specifically, the checkout page appears uncluttered; the "View Terms and Conditions" hyperlink itself is at the end of the short assent text paragraph in red print, in sharp contrast to both the white background of the page and the black text of the rest of the paragraph; the assent button-box and text is spatially and temporally coupled with the hyperlink, *i.e.*, the assent button-box and text appear with the hyperlink in the same short paragraph on the checkout page without requiring any scrolling; and the hyperlink text clearly prompts someone to "view" the Summit T&Cs. *See* Williams Supp.

Decl. Exs. A & B; *see, e.g.*, *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 831 (S.D.N.Y. 2020)

(finding reasonably conspicuous notice where there was a clear color contrast against a white

background and spatial and temporal coupling of the hyperlinks with a sign-up button); *cf.*

*Applebaum v. Lyft, Inc.*, 263, F. Supp. 3d 454, 467 (S.D.N.Y. 2017) (finding "no familiar indicia

to inform consumers that there was in fact a hyperlink that should be clicked and that a contract

should be reviewed, such as words to that effect, underlining, bolding, capitalization,

italicization, or large font").[3]

Indeed, in *Edmundson v. Klarna, Inc.*, which Plaintiffs cite in their opposition, the

Second Circuit held that, as a matter of law, a similar interface provided reasonably conspicuous

notice of the terms at issue.  *See* 85 F.4th 695, 705–07 (2d Cir. 2023).  The Second Circuit

reasoned that several factors, which are similar to the checkout page presented to Plaintiffs,

supported a finding of reasonably conspicuous notice of the terms, including (1) an uncluttered

interface with fields to enter credit card details and one link; (2) underlining and color contrast of

the hyperlink text; and (3) spatial and temporal coupling of the terms, which appear directly

adjacent to the assent button, and the assent statement, which appears directly above the button

to confirm and continue.  *Id.*

In contrast, the other cases cited by Plaintiffs in support of their argument that the

checkout page did not provide sufficient notice of the Summit T&Cs are distinguishable or

inapplicable.  For example, in *Nicosia v. Amazon.com, Inc.*, the Second Circuit held that

"reasonable minds could disagree on the reasonableness of notice" where the interface in

---

[3] To the extent Defendants made changes to the Website, *see* Svensson Decl. Ex. D, Plaintiffs concede that these ranged from "minor imagery edits to [the] size and overall font of text presented on the Website, to ticket pricing," Opp. at 11, none of which compels the Court to reach a different conclusion with respect to Plaintiffs' inquiry notice and the clarity and conspicuousness of the Summit T&Cs.

question contained between fifteen to twenty-five links, various text in at least four font sizes and six colors, multiple buttons and promotional advertisements, and additional clutter related to the customer's information and purchase details.   834 F.3d at 237–38, 241 (Addendum B).  The interface in *Nicosia* is clearly dissimilar from the checkout page presented to Plaintiffs.

Moreover, the Court is not persuaded by Plaintiffs' other various arguments that Defendants have failed to demonstrate that Plaintiffs entered into valid and enforceable arbitration agreements.  At bottom, Plaintiffs do not meaningfully or plausibly dispute that they were required to click the button box, thereby assenting to the Summit T&Cs, before they could complete their purchases, and have not submitted any evidentiary facts showing that there is a triable dispute of fact as to the existence of an arbitration agreement.  *See Zachman*, 49 F.4th at 102; *Oppenheimer & Co.*, 56 F.3d at 358.

Indeed, the evidence submitted by Plaintiffs substantiates the Court's finding of valid and enforceable arbitration agreements.  Included in Mark Svensson's[4] affidavit in support of Plaintiffs' opposition is a full screenshot of a checkout page, Figure 16, that includes the same button box and language indicating assent to the Summit T&Cs as Figure 6 of Mr. Williams' original declaration.  Dkt. No. 24-1 ("Svensson Aff.") ¶¶ 10–11.  Mr. Svensson hedges Figure 16 as "for illustrative purposes only" and asserts that the checkout page was a "dynamic webpage," subject to visitor-specific and regular updates.  *See id.* ¶ 10.  But nothing on the face of Figure 16 or anything submitted by Plaintiffs suggests that the button box and assent language was regularly updated to integrate content or data specific to unique users.  The only visitor-specific

---

[4] In his affidavit, Mr. Svensson does not identify who he is or his relationship to Plaintiffs.  He is not counsel of record for Plaintiffs but appears to be an attorney. *See About Me*, MARKSVENSSON.COM, https://www.marksvensson.com/about (last visited on June 26, 2025).

information that appears subject to change is the information regarding the costs and fees of the ticket(s) to be purchased and payment information. *See id.*

Plaintiffs also incorrectly assert that Defendants have not submitted "all of the applicable terms and do not specify which terms each plaintiff was presented with during their respective ticket purchases." Opp. at 11. The Summit T&Cs are the only applicable terms to this dispute, and in his original declaration, Mr. Williams specifically and properly distinguished between the specific language of the Gutman T&C and the Newman & Wong T&C. *See* Williams Decl. ¶¶ 10–14. The existence of other terms and conditions, the so-called "Webpage Terms" described by Plaintiffs, which were terms of use of the Website, *see* Opp. at 11–14, does not undermine the nature and effect of the arbitration provisions included in the Summit T&Cs. In a conclusory manner, Plaintiffs claim there is a "clear conflict," *see id.* at 13–14, between the Summit T&Cs and the Webpage Terms, but Plaintiffs fail to point to any meaningful discrepancy or, even assuming such a discrepancy existed, fail to show how a conflict between the terms as to other matters would void the arbitration provisions in the Summit T&Cs. *Cf. Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 366, 370–72 (2d Cir. 2003) (finding no agreement to arbitrate where the parties signed different sets of documents, but neither party signed a single document containing the full agreed-upon arbitration procedures).

Similarly, Plaintiffs' concerns and criticisms over the authenticity of the figures in Mr. Williams' declaration are speculative. *See* Opp. at 10–11. The Court finds Mr. Williams' sworn representations and the figures included in his declaration are properly substantiated and supported by Summit OVA's internal records of Plaintiffs' purchases and Mr. Williams' familiarity with the Website and ticket purchase process in his capacity as General Manager and Managing Director of Summit OVA, which includes oversight over the operation of the Website.

13

*See* Williams Decl. ¶¶ 1, 7, 9.  Moreover, in response to Plaintiffs' arguments regarding the nature of the screenshots included in Mr. Williams' original declaration, *see* Opp. at 10–11, Defendants submitted full and uncropped images of the checkout pages presented to Plaintiffs at the time of their purchases, and Mr. Williams represented in a sworn declaration that these images were produced through a restoration process using the code and data from the relevant purchase dates.[5]  *See* Williams Supp. Decl. ¶¶ 4–7 (explaining the only change to the checkout page between when Gutman purchased his ticket and when Newman and Wong purchased their tickets was the addition of "Gift Card" as a payment option), Exs. A & B (Gutman checkout page and Newman & Wong checkout page, respectively).

Plaintiffs' other various attempts to discredit the evidence submitted by Defendants are premised on conjectural suspicion and misplace or heighten the burden of proof on Defendants. *See, e.g.*, Opp. at 10 (suggesting Defendants have left the Court "to take [their] untested witness at his word that the images he provided to the Court were what the three Plaintiffs saw"), 12–14 (arguing Defendants failed "to demonstrate what plaintiff Gutman actually saw, read, or clicked" and "[t]here is no verifiable information that either plaintiffs Wong or Newman encountered the checkout page").  None of Plaintiffs' arguments persuade the Court, especially given Plaintiffs' own general and vague recollections of their purchases.  *See, e.g., Teta v. Go New York Tours,*

---

[5] In his original declaration, Mr. Williams did represent that the partial screenshots of the online ticket purchase process reflected the requisite steps each Plaintiff completed when purchasing their tickets on the Website.  *See* Williams Decl. ¶ 8.  While the Court does not find that Plaintiffs raised a colorable basis to undermine the veracity of the partial screenshots included in Mr. Williams' original declaration, the full screenshots of the checkout pages appended to Mr. Williams' supplemental declaration are properly before the Court as part of the evidentiary record because, as noted by Defendants in their reply, *see* Reply at 3 n.2, this evidence is directly responsive to Plaintiffs' arguments in their opposition.  *See, e.g., Yorke v. TSE Grp. LLC*, No. 18-CV-05268 (JMF), 2019 WL 3219384, at *2 (S.D.N.Y. July 17, 2019); *cf. Dreyfuss v. Etelecare Glob. Solutions-U.S. Inc.*, 349 F. App'x 551, 554–55 (2d Cir. 2009) (finding a two-page fragment of the purported arbitration agreement was insufficient to show "the meeting of the minds necessary for the existence of an enforceable contract," where the movant conceded that it could not locate a complete copy of the signed agreement).

*Inc.*, 738 F. Supp. 3d 502, 509 (S.D.N.Y. 2024) (finding "no genuine dispute" that the arbitration provisions at issue were binding given the plaintiffs' "insinuation that they never agreed to the terms [was] without factual basis"). In their affidavits, Plaintiffs claim they do not recall (1) seeing or clicking on a button box at checkout or (2) seeing or reading any documents containing an arbitration clause or seeing the term "arbitration" used in connection with their purchases. Dkt. No. 24-6 ("Newman Aff.") ¶¶ 2–3; Dkt. No. 24-7 ("Gutman Aff.") ¶¶ 2, 4; Dkt. No. 24-8 ("Wong Aff.") ¶¶ 2–3; *see also* Opp. at 9–10. The former point is a general denial of Plaintiffs' assent to the Summit T&Cs, which is insufficient to undermine Defendants' *prima facie* showing that the Summit T&Cs are valid and enforceable arbitration agreements. The latter point is inapposite—it is well-settled under New York law that mere failure to read the terms and conditions does not obviate Plaintiffs' assent to the Summit T&Cs. *See Fteja*, 841 F. Supp. 2d at 839–40; *see also Meyer*, 868 F.3d at 78–79.

Accordingly, in light of the record evidence before the Court, viewed in its totality, the Court finds that Defendants have established that, upon purchasing their tickets, Plaintiffs assented to the Summit T&Cs, and that the Summit T&Cs contain valid and enforceable arbitration agreements. *See Meyer*, 868 F.3d at 78–80; *Oppenheimer & Co.*, 56 F.3d at 358; *see also* Opp. at 16 (conceding the Second Circuit compelled arbitration in *Meyer*, which involved a similar clickwrap agreement).

### 3.    Expedited Discovery Is Not Warranted

In connection with Plaintiffs' assertion that Defendants have not properly proven which terms were presented to Plaintiffs, Plaintiffs request leave to seek discovery on "what Defendants' checkout page looked like at the time of [Plaintiffs'] purchases and what information was actually included in the [Summit T&Cs] hyperlink." *See* Opp. at 4. The request is denied—Plaintiffs have not established good cause for expedited discovery under Rule

15

26(d)(1).  As discussed *supra*, Plaintiffs speculatively claim that Defendants have, in various ways, failed to submit accurate, complete, and substantiated evidence to support the finding of the existence of valid arbitration agreements, and that Mr. Williams, a purported "untested witness," and his sworn declaration is not to be believed.  *See* Opp. at 10.  Because the Court does not find a genuine or reasonable dispute over the existence and validity of the Summit T&Cs, Plaintiffs have failed to show even a minimal chance of success on the merits of its opposition to Defendants' motion to compel arbitration, and therefore, there is no good cause to justify expedited discovery.

### B.  Arbitrability

Because the Court finds that the Summit T&Cs are presumptively valid agreements between the parties, the Court will now consider whether the issue of arbitrability, *i.e.*, the determination of whether Plaintiffs' claims fall within the scope of the arbitration provisions in the Summit T&Cs, is before the Court or is properly referred to the arbitrator.

"Under the FAA, there is a general presumption that the issue of arbitrability should be resolved by the courts."  *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005).  However, "[a]cknowledging this presumption, [the Second Circuit] ha[s] held that 'the issue of arbitrability may only be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator.'"  *Id.* (emphasis omitted) (quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2003)).

As a threshold matter, Plaintiffs do not genuinely contest the delegation of the issue of arbitrability and, instead, reiterate their arguments about whether they assented to the Summit T&Cs.  *See* Opp. at 18–19 ("Under Second Circuit precedent, '[w]hen parties disagree about whether they ever entered into an arbitration agreement, a court decides that issue, <u>absent clear</u>

16

and unmistakable delegation of that authority to an arbitrator.'") (emphasis added) (quoting

*Abram Landau Real Estate v. Benova*, 123 F.3d 69, 72 (2d Cir. 1997)).

In *Rent-A-Center, West, Inc. v. Jackson*, the Supreme Court held that courts must enforce

delegation provisions, unless they are unenforceable under Section 2 of the FAA.  561 U.S. 63,

68–70 (2010).  In their opposition, Plaintiffs excerpt and mischaracterize portions of *Rent-A-

Center*.  There, the Court held that, unless a delegation provision is specifically challenged, such

a provision must be treated as valid and enforceable under the FAA, leaving any challenge as to

the validity of the agreement as a whole for the arbitrator.  *See id.* at 72–75.  However, where, as

here, Plaintiffs challenge only the validity of the contract as a whole, such as on grounds of

unconscionability, *see* Opp. at 19–20, Plaintiffs have failed to specifically rebut or otherwise

address in any way Defendants' argument that the arbitrator must decide Plaintiffs' challenges to

the scope of the Summit T&Cs.  *See id.* at 18–22; Reply at 9 (referencing Plaintiffs' failure to

address Defendants' arguments regarding delegation of arbitrability).

Accordingly, for the reasons detailed below, the Court declines to rule on the merits on

the arbitrability of Plaintiffs' claims or on Plaintiffs' other arguments regarding the

unenforceability of the Summit T&Cs and, shall submit such issues to the arbitrator.[6]

### 1.    Newman & Wong T&C

The arbitration provision in the Newman & Wong T&C provides that any arbitration

"will be conducted in accordance with the expedited procedures set forth in the JAMS

---

[6] Even if the Court were to consider the arbitrability of Plaintiffs' claims, it is well-settled that broadly worded mandatory arbitration provisions generally give rise to the presumption of arbitrability. *See, e.g.*, *Collins*, 58 F.3d at 20 ("The clause in this case, submitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause.") (alterations in original); *Vasell v. SeatGeek, Inc.*, No. 24-CV-00932 (NCM) (JRC), 2025 WL 240912, at *7 (E.D.N.Y. Jan. 17, 2025) (holding an arbitration clause with broad terms covering "any dispute, claim, or controversy" covered alleged violations of Section 25.07(4) during certain purchases and prior to the acceptance of the relevant terms and conditions).

Comprehensive Arbitration Rules and Procedures [the "JAMS Rules"] as those Rule exist on

[August 10, 2021]."  Newman & Wong T&C ¶ 10.  Rule 11(b) of the JAMS Rules provides:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which [a]rbitration is sought, and who are proper [p]arties to the [a]rbitration, shall be submitted to and ruled on by the [a]rbitrator.  The [a]rbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

JAMS Comprehensive Arb. R. & P. 11(b) (eff. June 1, 2021), available at https://www.jamsadr.

com/rules-comprehensive-arbitration.  "[W]hen, as here, parties explicitly incorporate rules that

empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and

unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *Emilio v.*

*Sprint Spectrum L.P.*, 508 F. App'x 3, 5 (2d Cir. 2013) (holding that "the parties clearly and

unmistakably delegated questions of arbitrability to the arbitrator" where the arbitration clause

invoked the 2003 JAMS Rules, which included substantially the same language regarding

delegation).

　　　　Accordingly, under the plain language of the Newman & Wong T&C, Newman and

Wong have clearly committed gateway questions of arbitrability to the arbitrator.

### 2.    Gutman T&C

　　　　The arbitration provision in the Gutman T&C provides that any arbitration "will be

conducted by the American Arbitration Association (AAA) under its then-current rules,

including the AAA's Supplementary Procedures for Consumer-Related Disputes."  Gutman

T&C ¶ 5.  While the Gutman T&C's reference to the AAA's "then-current rules" is somewhat

ambiguous, ultimately, the Court finds that Gutman and Defendants have also delegated the issue

of arbitrability to the arbitrator.

　　　　In their papers, Defendants appear to refer to the AAA's Commercial Arbitration Rules

and Mediation Procedures (the "AAA Commercial Rules"), which were amended and effective

as of September 1, 2022.  *See* Mot. at 11–12; Reply at 9.  Rule R-7(a) of the AAA Commercial

Rules provides:

> The arbitrator shall have the power to rule on his or her own jurisdiction, including
> any objections with respect to the existence, scope, or validity of the arbitration
> agreement or to the arbitrability of any claim or counterclaim, without any need to
> refer such matters first to a court.

AAA Comm. Arb. R & Mediation P. R-7(a) (amended & eff. Sept. 1, 2022), available at

https://www.adr.org/media/lwanubnp/2025_commercialrules_web.pdf.  Courts in this Circuit

have previously held that the AAA Commercial Rules "explicitly empower an arbitrator to

resolve questions of arbitrability" and that "incorporation of these rules into an arbitration

agreement . . . is clear and unmistakable evidence of the parties' intent to delegate the question of

arbitrability to the arbitrator."  *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d

Cir. 2021); *see, e.g.*, *Shenzhen Xingchen Xuanyuan Ind. Co. Ltd. v. Amazon.com Servs. LLC*, 735

F. Supp. 3d 453, 463 (S.D.N.Y. 2024).

The AAA's Consumer Arbitration Rules and Mediation Procedures (the "AAA

Consumer Rules") are also incorporated by the Summit T&Cs, which refer to the AAA

Consumer Rules by their former name, the "Consumer Related Disputes Supplementary

Procedures."[7]  Rule R-7(a) of the AAA Consumer Rules includes essentially the same language

with respect to the arbitrator's jurisdiction and provides:

---

[7] There are various "Consumer Related Disputes Supplementary Procedures," which are archived
on the AAA's website.  *See Archived Rules*, AM. ARB. ASS'N, https://www.adr.org/ArchiveRules (last
visited June 26, 2025).  The "Consumer Related Disputes Supplementary Procedures" were renamed
the "Consumer Arbitration Rules."  *See* AAA Consumer Arb. R. R-1(a)(2) (amended & eff. Sept. 1,
2014), available at https://www.adr.org/media/tiifv2ft/consumer_rules_web.pdf ("The parties shall have
made these *Consumer Arbitration Rules* ('Rules') a part of their arbitration agreement whenever they
have provided for arbitration by the American Arbitration Association ('AAA'), and have specified that
the *Supplementary Procedures for Consumer-Related Disputes* shall apply, which have been amended
and renamed the *Consumer Arbitration Rules*[.]") (italics in original).

> The arbitrator shall have the power to rule on their own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or the arbitrability of any claim or counterclaim.

AAA Consumer Arb. R. & Mediation P. R-7 (eff. May 1, 2025), available at https://www.adr.org/sites/default/files/2025_Consumer_Arbitration_Rules.pdf.[8]

Accordingly, under the plain language of the Gutman T&C, Gutman has clearly committed gateway questions of arbitrability to the arbitrator. *See, e.g.*, *Cimillo v. Experian Info. Solutions, Inc.*, No. 21-CV-09132 (VB), 2023 WL 2473403, at *8 (S.D.N.Y. Mar. 13, 2023).

**C. Class Action Waiver**

As described above, the Summit T&Cs include class action waiver provisions. Defendants argue that these waivers bar Plaintiffs from bringing a class action, and that Plaintiffs must individually arbitrate their claims. *See* Mot. at 14–15. Plaintiffs do not reference the class action waiver provisions or otherwise address Defendants' arguments at all in their opposition.

The class action waiver provision in the Newman & Wong T&C explicitly provides that any arbitration shall take place "on an individual basis"; Newman and Wong's claims may be brought "only in [their] . . . individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding"; "class arbitrations and class actions are not permitted"; and that Newman and Wong agreed to "give up the ability to participate in a class arbitration or class action." Newman & Wong T&C ¶ 10 (text case altered). Similarly, the class action waiver provision in the Gutman T&C provides that any arbitration "will be conducted

---

[8] Rule R-7(a) of the AAA Commercial Rules includes an additional clause, regarding the arbitrator's power to determine its own jurisdiction, "without any need to refer such matters first to a court." AAA Comm. Arb. R & Mediation P. R-7(a). This minor distinction is of no moment, as the arbitrator's power to determine issues of arbitrability under the AAA Consumer Rules is not qualified or caveated in any particular way that would compel the Court to reach a different conclusion regarding the Gutman T&C's delegation of arbitrability to the arbitrator.

only on an individual basis and not in a class, consolidated, or representative action."  Gutman
T&C ¶ 5.

Accordingly, because the Summit T&Cs are enforceable, under the plain terms of the
class action waiver provisions, Plaintiffs may not bring this action on behalf of a putative class,
and Plaintiffs must individually arbitrate their claims.  *See Tsadilas v. Providian Nat. Bank*, 13
A.D.3d 190, 191 (1st Dep't 2004) (enforcing class action waiver because, "[u]nder New York
law, a contractual proscription against class actions is neither unconscionable nor violative of
public policy") (internal citation omitted); *see also Chen-Oster*, 449 F. Supp. 3d at 250–52
("And, as the Supreme Court has held, arbitration clauses are not unconscionable merely because
they preclude class-wide action or relief.") (internal footnote omitted) (citing *AT&T Mobility
LLC v. Concepcion*, 563 U.S. 333, 351–52 (2011)).

## III.    STAY OF PROCEEDINGS

Under Section 3 of the FAA, a district court must stay the judicial proceedings upon
"application of one of the parties" where the asserted claims are "referable to arbitration."  9
U.S.C. § 3.  Staying a case referred to arbitration, as opposed to dismissing, "is consistent with
the FAA's underlying policy 'to move the parties to an arbitrable dispute out of court and into
arbitration as quickly and as easily as possible' . . . unencumbered by the uncertainty and
expense of additional litigation."  *Katz v. Cellco P'ship*, 794 F.3d 341, 346 (2d Cir. 2015)
(quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 22).  Because Defendants have requested a
stay of litigation pending arbitration, *see* Mot. at 2, and all Plaintiffs' claims shall be referred to
arbitration, the Court shall stay the proceedings in this action pending arbitration.  *See, e.g.*, *Kim
v. LG H&H USA, Inc.*, No. 25-CV-00557 (LJL), 2025 WL 1019393, at *5 (S.D.N.Y. Apr. 4,

2025) (staying proceedings where the defendants requested a stay and all claims were referred to arbitration).

**CONCLUSION**

For the foregoing reasons, Defendants' motion to compel arbitration is GRANTED, and this case shall be STAYED pending the resolution of Plaintiffs' individual arbitrations. The parties shall file a joint status letter either (i) no later than 120 days from the date of this Order, regarding the status of Plaintiffs' arbitrations; or (ii) within 7 days of the conclusion of Plaintiffs' arbitrations, addressing why this case should not be dismissed at that time, whichever is sooner.

The Clerk of Court is respectfully directed to terminate Dkt. No. 20.

Dated:  June 26, 2025
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge